**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PASTORA ELENA BARROETA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16 C 7947 |
| v. | ) | |
| | ) | |
| ASTELLAS PHARMA GLOBAL | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On August 8, 2016, Plaintiff Pastora Elena Barroeta ("Barroeta") filed the present Complaint alleging violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq.* ("IHRA"). Barroeta specifically alleges a failure to accommodate claim and a retaliation claim against her former employer Defendant Astellas Pharma Global Development, Inc. ("Astellas"). Before the Court is Astellas' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants Astellas' motion and dismisses this lawsuit in its entirety.

**BACKGROUND**

**I.      Introduction**

Astellas, headquartered in Northbrook, Illinois, is a global pharmaceutical development company that employed Barroeta as its Director of Latin American Regulatory Affairs from October 2011 until January 2015. (R. 37, Def.'s Rule 56.1 Stmt. Facts ¶¶ 1, 2.) Astellas' written job description for the Director of Latin American Regulatory Affairs highlighted the

fundamental job duties of the position as developing and executing strategies, plans, and processes for products and therapeutic areas to ensure compliance with Latin American regulatory and business requirements. (*Id.* ¶ 8.) Barroeta's specific job duties included managing assigned projects, assessing available resources, establishing project priorities and timelines for assigned work, handling technical topics, interpreting regulations, overseeing submissions for new products and responses to regulators' deficiency letters pertaining to those submissions, and developing and leading her team. (*Id.* ¶ 9.)

Barroeta's qualifications for the position of Director of Latin American Regulatory Affairs included her Bachelors of Pharmacy Degree from the Central University of Venezuela and her Master's Degree in Science and Technology from London University. (*Id.* ¶ 3.) Prior to working for Astellas, Barroeta worked at several prominent pharmaceutical companies in regulatory management jobs and these jobs included employee supervision. (*Id.* ¶ 4.) Starting in 2012, Barroeta reported to Robert Reed ("Reed"), Astellas' Senior Director of Regulatory Affairs. (*Id.* ¶ 5.) During the relevant time period, Reed reported to Astellas' Vice President of Regulatory Affairs, Marcia Marconi ("Marconi"). (*Id.* ¶ 6.)

## II.     Left Arm Injury

On September 30, 2013, Barroeta fell at the Miami International Airport while on a work assignment and seriously injured her left arm. (Def.'s Stmt. Facts ¶ 31.) As a result, Barroeta suffered partial paralysis to her left arm. (Pl.'s Stmt. Facts ¶ 11.) Barroeta did not return to work until sometime in December 2013. (*Id.* ¶ 16; Def.'s Stmt. Facts ¶ 32.) Her physician released her to work with the restrictions of no pushing, pulling, lifting, or gripping with the left arm. (Def.'s Stmt. Facts ¶ 33.) After consulting with Lorraine Daly, who oversaw Barroeta's human resource concerns, Barroeta worked from home at least three days a week during the time period

of December 2013 through March 2014, so she could attend occupational therapy near her home. (*Id.* ¶¶ 34, 35; Pl.'s Stmt. Facts ¶ 26.)

When Barroeta returned to work after her accident, she met with her supervisor Robert Reed to discuss her condition. (Pl.'s Stmt. Facts ¶ 22.) After her return to work, Reed told Barroeta that "I'm always here. If you need something, let me know." (Def.'s Stmt. Facts ¶ 37.) Also, Reed met with Barroeta on a weekly – if not daily – basis to talk about what would assist her in her job. (*Id.* ¶ 38.) Barroeta informed Reed that she was unable to type with her left hand, although she could type with her right hand. (Pl.'s Stmt. Facts ¶ 22; Def.'s Stmt. Facts ¶ 42.) Many of Barroeta's tasks involved using a computer and when asked if there was anything Astellas could do for her, Barroeta told Daly that voice-activated dictation equipment would help with her typing. (Pl.'s Stmt. Facts ¶ 34; Def.'s Stmt. Facts ¶ 40.) Although Astellas did not provide Barroeta with a voice-activated device, when Reed learned that Barroeta could not type with her left hand, he talked to Daly about hiring a contractor to help with Barroeta's typing. (R. 42, Def.'s Resp. ¶ 24.) Thereafter, Astellas hired a contractor, Julia Rodriquez, who assumed some of Barroeta's typing duties. (Def.'s Stmt. Facts ¶ 43.) Also, Barroeta's supervisor assisted in some of her duties, including working on databases and interviewing contractors. (*Id.* ¶ 44.) It is undisputed that Barroeta's left arm injury did not completely prevent her from typing or using a computer mouse because she could type with her dominant right hand. (*Id.* ¶ 42.)

## III.   Performance Action Plan

Based on Barroeta's prior performance reviews, in August 2014, Reed met with Lorraine Daly in human resources, after which Reed drafted a 90-day Performance Action Plan ("PAP") addressing Barroeta's performance shortcomings. (*Id.* ¶¶ 26, 27, 51.) Reed delivered Barroeta's PAP to her during an hour-long discussion on September 30, 2014. (*Id.* ¶ 52.) Barroeta's PAP

identified multiple problem areas, including Barroeta's lack of proactive planning and coordination of team activities, lax supervision of staff, failure to achieve goals, and inappropriate communications with stakeholders. (*Id*. ¶ 53.) Her PAP also set forth specific tasks for Barroeta to be complete within 30 days, such as the preparation of a comprehensive submission planning tool, re-establishing monthly meetings with certain stakeholders, establishing weekly one-on-one meetings with staff, and holding development discussions. (*Id*. ¶ 54.) Furthermore, the PAP required Barroeta to complete additional tasks within 60 days, including: (1) working with the Regulatory Affairs Submissions team to prepare an archive for Latin American submissions; (2) identifying, hiring, and on-boarding contractors for submissions work; and (3) ensuring 100% compliance with Latin American change control assessments. (*Id*. ¶ 55.) The PAP set forth tasks to be completed within 90 days, including preparing lessons-learned presentation on specific recent submissions and submission templates for Mexico. (*Id*. ¶ 56.) These tasks were primarily review functions, either in hard copy or on the computer for which Barroeta could use a computer mouse. (*Id*. ¶ 57.) The plan cautioned Barroeta that failure to improve in these areas would result in Astellas terminating her employment. (*Id*. ¶ 58.)

After their September 30, 2014 meeting, Reed and Barroeta met periodically to discuss her progress on the PAP, after which Reed would document these conversations in emails to Barroeta. (*Id*. ¶¶ 59, 60.) On November 14, 2014, the 45-day mark of her PAP, Barroeta met with Reed and Marconi to discuss her progress. (*Id*. ¶ 61.) In this meeting, Marconi and Reed explained to Barroeta that she was not showing the requisite progress and that her job was in serious jeopardy. (*Id*. ¶ 62.) Also during this meeting, Barroeta stated that she was overwhelmed by the work and lack of resources, but did not request any accommodation for her injured left arm. (*Id*. ¶ 63.) Instead, Barroeta believed that the Latin American Regulatory

Affairs Department was understaffed and that Astellas should hire more employees for the department. (*Id.* ¶ 21.) In fact, it is undisputed that Barroeta never asked Reed for a specific accommodation or change that might have helped her perform her job, except for hiring more staff. (*Id.* ¶ 39.)

It is undisputed that during this time period, Barroeta shifted her focus away from completing the PAP tasks to work on other matters that she considered more important. (*Id.* ¶ 64.) On January 13, 2015, Barroeta informed Reed that she had given other work matters a higher priority than the specific tasks highlighted by her PAP. (*Id.* ¶ 66.) The next day, on January 14, 2015, Reed sent Marconi a memorandum indicating that Barroeta had not completed ten of thirteen action items on her PAP. (*Id.* ¶ 68.) More specifically, Barroeta had failed to prepare a comprehensive submissions planning tool, re-establish monthly meetings with stakeholders, ensure 100% compliance with Latin American change control assessments, and prepare a submissions template for Mexico. (*Id.* ¶ 69.) Sometime in mid-January 2015, Reed told Barroeta to either resign or "we are going to terminate you." (*Id.* ¶ 71.) On January 16, 2015, Plaintiff submitted her written resignation letter to Reed and Marconi, which stated the following:

> Unfortunately, my health situation has deteriorated as a result of the fall I sustained on Sep. 30, 2013 with resultant left shoulder fracture, dislocation, nerve damage and development of Complex Regional Pain Syndrome (CRPS) with intense pain that has gotten worse rather than better over time. This situation requires my full attention which leaves me no time to fulfill my duties as currently required by the company.

> Thank you for the opportunities that you have provided me during the last three years. I have enjoyed working for Astellas and appreciate the support provided me during my tenure with the company.

(*Id.* ¶¶ 72, 74.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citations omitted).

## ANALYSIS[1]

### I.     Failure to Accommodate Claim – Counts I and III

In Counts I and III of her Complaint, Barroeta alleges that Astellas failed to reasonably accommodate her disability under the ADA and IHRA. To establish a failure to accommodate

---

[1] Plaintiff brings her failure to accommodate claims in Counts I and III and her retaliation claims in Counts II and IV pursuant to the ADA and IHRA. In evaluating IHRA claims, courts look to the standards applicable in the analogous federal statutes. *See Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013).

claim, Barroeta must present evidence raising a triable issue of fact that: (1) she is a qualified individual with a disability; (2) Astellas was aware of her disability; and (3) Astellas failed to reasonably accommodate her disability. *See EEOC v. AutoZone, Inc.,* 809 F.3d 916, 919 (7th Cir. 2016). For purposes of this motion, the Court assumes that Barroeta is a qualified individual with a disability and that Astellas was aware of her disability and physical limitations. The Court thus focuses on whether Astellas failed to reasonably accommodate Barroeta's disability.

Here, Barroeta argues that Astellas failed to engage in the interactive process to determine whether a reasonable accommodation existed that would allow her to perform the essential functions of her job. *See Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 821 (7th Cir. 2017) ("Identifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process."). Barroeta's main argument is that Astellas failed to accommodate her left arm injury because it did not provide her with a voice-activated device – although she admits that a voice-activated device would not help during meetings when other people were talking and that her job entailed multiple staff meetings. (Def.'s Stmt. Facts ¶¶ 12, 41.) Instead of providing the voice-activated equipment, Astellas hired a contractor, who assumed some Barroeta's typing duties. Also, her direct manager, who regularly communicated with Barroeta about her needs, assumed some of her other duties, such as conducting searches on databases and interviewing contractors. Further, the parties do not dispute that Barroeta's left arm injury did not prevent her from typing or using the mouse on her computer because she could type with her dominant right hand to complete certain tasks.

Despite Barroeta's arguments to the contrary, it is well-settled that "the ADA does not entitle a disabled employee to the accommodation of his choice," but "[r]ather, the law entitles him to a *reasonable* accommodation in view of his limitations and his employer's needs."

*Swanson v. Village of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015) (emphasis in original); *see also Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer.").  That Astellas did not provide Barroeta with a voice-activated device is not dispositive, especially in light of the other accommodations Astellas provided, as discussed immediately above.  Also, Barroeta does not explain why these accommodations were unreasonable nor does she mention the other accommodations Astellas provided, such as allowing Barroeta to take over two months of leave, after which Barroeta returned to work part-time working from home to accommodate her occupational therapy needs.

Barroeta further argues that her human resources representative, Lorraine Daly, did not have discussions with her about her progress.  That Daly did not sufficiently communicate with Barroeta fails to take into account Reed's regular, sometimes daily, interactions with Barroeta about her injury and work needs.  Not only did Reed tell Barroeta that "I'm always here.  If you need something, let me know," it is undisputed that Barroeta never asked Reed for a specific accommodation or change that might have helped her perform her job, except for hiring more people because she believed that her department was understaffed.  Barroeta, however, fails to argue or substantiate with legal authority how hiring more staff would have been a reasonable accommodation under the circumstances.  *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Ultimately, "[i]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000).  Based on the undisputed

evidence in the record, Barroeta has failed to show that a reasonable factfinder could conclude that Astellas failed to accommodate her injury by not providing a voice-activated device. *See Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012) ("An employer satisfies its duty to reasonably accommodate an employee with a disability when the employer does what is necessary to allow the employee to work in reasonable comfort."). Also, there is no evidence in the record that Astellas looked the other way or "sat on its hands," instead of engaging Barroeta in conversations about her injury, especially because she had consistent, sometimes daily, interactions with her direct manager about her job needs, and thus she has not demonstrated that Astellas terminated the interactive process in the first instance. *See Lawler,* 837 F.3d at 786-87. The Court thus grants Astellas' summary judgment motion as to Counts I and III.

## II. Retaliation Claim – Counts II and IV

In Counts II and IV, Barroeta maintains that Astellas terminated her employment in retaliation for requesting an accommodation in relation to her left arm injury. The ADA "protects employees who suffer retaliation after seeking an accommodation by their employer, or filing a complaint of discrimination on account of a disability[.]" *Hirmiz v. New Harrison Hotel Corp.,* 865 F.3d 475, 476 (7th Cir. 2017); *see also* 42 U.S.C. § 12203(a). To survive summary judgment on her retaliation claim, Barroeta must set forth evidence raising a genuine issue of material fact that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) a causal link between the protected activity and the adverse action. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017).

The parties do not dispute that Barroeta engaged in a protected activity and that she suffered an adverse action because it is undisputed that if Barroeta had not resigned, Astellas would have discharged her. Accordingly, the Court looks to the whether a causal link exists,

namely, whether there is evidence in which a jury could infer retaliation. *See id.* (courts "no longer recognize a distinction between direct or indirect evidence, and instead consider all of the record evidence to determine whether a causal link exists."); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."). A plaintiff can demonstrate a causal connection by showing that the defendant would not have taken the adverse action, but for plaintiff's protected activity. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). Suspicious timing can also provide circumstantial evidence of retaliation. *See Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) ("Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence.").

Viewing the evidence and all reasonable inferences in Barroeta's favor, she has not presented any evidence suggesting that Astellas would not have terminated her employment had she not seriously injured her left arm. Instead, undisputed evidence indicates that during Barroeta's PAP period, she shifted her focus away from completing the specific tasks outlined so she could work on other matters that she considered more important. Further, it is undisputed that she told Reed that she had given other work matters a higher priority than the specific tasks in her PAP. The parties do not dispute that Barroeta had not completed ten of thirteen action items on her PAP, including failing to prepare a comprehensive submissions planning tool, re-establish monthly meetings with stakeholders, ensure 100% compliance with Latin American change control assessments, and prepare a submissions template for Mexico. There is also undisputed evidence that Barroeta's job performance was deficient prior to her injury, including

her 2012 performance appraisal where Reed criticized her for not being sufficiently engaged with business partners, affiliates, and staff, and that Barroeta needed to consider available resources "to insure that she can deliver to expectations." (Def.'s Stmt. Facts ¶¶ 26, 27.)

Barroeta next argues that because Reed delivered the PAP to her exactly one year to the day after she fell at the Miami International Airport, she has established a causal connection presumably due to the timing of these events. The timing of the PAP is not suggestive of retaliatory motive because one year is a significant time gap in the context of her tenure with Astellas. *See Nicholson v. City of Peoria, Illinois*, 860 F.3d 520, 524 (7th Cir. 2017) ("The passage of more than a year between protected activity and the adverse employment action is enough to "substantially weaken" a retaliation claim."). Moreover, suspicious timing, alone, is rarely sufficient to infer a causal link between the protected activity and the adverse action. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 681 (7th Cir. 2015). Without more, Barroeta has only offered speculation as to Astellas' alleged retaliatory motive. *See Lauth*, 863 F.3d at 717 ("speculation is insufficient to raise a question of fact").

Because Barroeta has failed to present evidence raising a triable issue of fact that there is a causal connection between the adverse action and her injury, the Court grants Astellas' summary judgment motion as to Counts II and IV of the Complaint.

## CONCLUSION

For these reasons, the Court grants Defendant's motion for summary judgment in its entirety and dismisses this lawsuit.

**Dated:** September 7, 2017

ENTERED

_____

**AMY J. ST. EVE**
**United States District Court Judge**